Filed 12/21/15  P. v. Sykes CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075060 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F03384) |
| v. | |
| BEVERLY ANN SYKES, | |
| Defendant and Appellant. | |

Defendant Beverly Ann Sykes appeals her convictions for first degree residential burglary and theft of property from an elder dependent adult.  Defendant contends: (1) the victim was not competent to testify at the time of the preliminary hearing/conditional examination[1] and therefore his testimony should not have been admitted at trial; (2) the magistrate presiding over the conditional examination found the

---

[1] This is the same hearing; for ease of reference/consistency, we will refer to it as the conditional examination.

1

victim was not competent to testify and the trial court should not have reversed that finding; and (3) the victim's capacity was so impaired at the conditional examination that defendant's confrontation rights were violated. Defendant also contends the trial court erred in failing to stay the sentence imposed for burglary pursuant to Penal Code section 654. We find no errors and affirm the judgment.

BACKGROUND

Defendant met the 82-year-old victim, Floyd North through his nephew, Charles. Charles told defendant that North was looking for someone to be his caregiver, drive him to appointments, and help him clean his house. Defendant was 37 years old when she started helping North in 2008.

At the end of December 2008, North had over $73,000 in his bank account. By the end of March 2011, he had $706.08 in his bank account.[2] Between February 2009 and March 2011, there were 22 transactions, checks, and bill pays made out to defendant drawn off North's account totaling over $20,000. Defendant had a Sears MasterCard issued on North's account, and North's bank accounts were used to pay the balance of that credit card. Between July 2010 and March 2011, over $18,000 was paid from North's account to Sears.[3] Between May 2010 and November 2010, there were approximately 38 withdrawals made from North's account from casinos. These "casino withdrawals" totaled over $9,000. The account also showed recurring payments being made for two separate insurance policies on which defendant was the named beneficiary. The first payment to an insurance company was made in June 2010.

Defendant claimed at some point after 2008, she and North became a romantic couple. She traveled to San Diego with North to attend a funeral in August 2009, where

---

[2] The account was closed for fraud in March 2011.

[3] North was hospitalized in July 2010 and remained living in the hospital or a board care facility through trial in 2013.

she met North's daughter, Robbie Williams. Williams was impressed with defendant's kindness and believed her father was in good hands.

Defendant testified she helped North write checks and pay his bills, and enrolled him in paperless billing using her e-mail address. North testified defendant would take him to his bank to get money, and he paid her.[4] But he claimed he paid his own bills and denied defendant helped him with that task.

In July 2010, North fell and broke his ankle. His neighbor Maria Vazquez received a phone call that North had fallen. She went to his home, saw he had a broken foot, and called 911. She did not see North return to his home. Defendant called Williams and informed her about North's fall. Defendant assured Williams she did not need help caring for North, and that everything was taken care of.

North moved to St. Claire's Nursing Center in December 2010. He was bedridden and not walking. Defendant was with North when he was admitted and represented herself as North's niece, both on his admission papers and to Kathleen Locke, the social services designee at St. Claire's.

In January or February 2011, Williams called defendant to check on her father. Defendant advised Williams she had not had contact with North and he did not want anything to do with her. By February 2011, Williams learned North was at St. Claire's and she came to visit him in March. North was very upset and told Williams that defendant had "used him, had taken his wallet, taken his checks, and wouldn't give back his wallet."

---

[4] During the preliminary hearing, the parties conducted a conditional examination of North. By the time of trial, North's condition had deteriorated to the point he could not testify at trial. The video was played for the jury and transcripts of the conditional examination were admitted into evidence.

Defendant admitted she had North's wallet and kept it after he was admitted to the hospital with a broken leg in July 2010. She returned the wallet in February 2011 when asked to by someone at the care facility. Defendant denied she had North's checks.

Williams obtained a power of attorney. She learned North's mail was being forwarded to defendant's address. Williams also discovered defendant had online access to North's bank accounts. Beginning in September 2008, North's bank statements were delivered electronically, but North did not own a computer.

*Car Payments from Vazquez*

In April 2008, North's neighbor, Maria Vazquez, purchased a van from North for $14,000. Vazquez agreed to pay a down payment of $2,000, and make monthly payments of $300. Vazquez paid North in cash on the first of every month and North gave her a signed receipt for the payment. Vazquez was familiar with defendant as North's caretaker, who helped him with household chores, prepared food, and drove him to doctor appointments.

When the van payment came due after North's hospitalization, defendant contacted Vazquez and asked her to give defendant the payment. Vazquez agreed, "[A]s long as [defendant] brought [her] an authorization signed by [North] and also the paperwork for the payment." Defendant brought Vazquez a note that appeared to be from North authorizing Vazquez to give the money to defendant. Accordingly, from August 2010 through March 2011, Vazquez made the monthly $300 car payments to defendant. Defendant provided Vazquez with receipts for the payments. The first receipt contained North's signature in original ink, by the second or third payment the signature was a copy, and some of the copied signatures were traced over with ink.

In March 2011, Williams contacted Vazquez and learned defendant was collecting the car payments. North told Williams he had not authorized defendant to collect the payments. Williams informed Vazquez and advised her to stop paying defendant. Williams then began collecting the payments herself.

4

Defendant admitted she had collected money from Vazquez for the car payments. She explained that in 2010, she and North applied for auto loans as a couple and eventually purchased a van. Defendant used that money to pay for the van defendant and North had purchased together. Defendant explained that had been the plan for the Vazquez car payments "from the beginning." Defendant admitted she never gave North the money from Vazquez. She claimed North eventually stopped signing the receipts himself because he believed it was unnecessary. Accordingly, she began copying his signature. She claimed North was aware she was going to collect the payments from Vazquez, and of her plan to copy his signature on the receipts.

North denied giving defendant permission to collect the car payments from Vazquez.

*Property Removed from North's Home*

North reported that at some point after the fall he returned to his house and there was no furniture in it.

In October 2010, Vazquez saw defendant and two men taking property, including furniture and a big screen television from North's home. Defendant explained she was taking North's belongings because he was being moved to another facility.

North told both Williams and Locke that defendant had stolen his television. He repeated this to Locke almost daily. Locke asked defendant about North's television. Defendant indicated it was in her front room and Locke suggested she should give it back. When Locke explained residents are allowed to bring in their own televisions, defendant brought one in for North. It was not, however, the television North claimed defendant had stolen from him. Defendant also told Locke that North wanted her to "clean out his house, to clear out his house, to clean it up."

Defendant testified after North was hospitalized, he refused to pay his property tax bill because he was not living in the house. He told defendant to "go ahead and clean that stuff out of there . . . I don't care what you do with it." A few months later, she hired two

5

men to help her take North's furniture, clothing, linens, and household items to Goodwill. She did not get a receipt because she was not aware she should. She took North's television to her home, because North wanted her to keep the television. Initially, he wanted it at St. Claire's, but it was too large. Accordingly, she bought him a different television for his room.

After her March 2011 visit with her father, Williams called defendant, who reported everything had been moved out of North's home. Williams called the Sheriff's Department and went to North's house. The house was virtually empty, except a bed and nightstand. Most of the furniture was gone, all of North's clothing was gone, and there were no papers, mail, or photographs in the house. On a second visit to the house, Williams also went into the garage. The garage was empty except for North's electric wheelchair and a washer or dryer. Defendant told Williams she had hired someone to take everything to Goodwill.

North denied asking defendant to move his belongings out of his home.

*Use of North's Credit Card*

Between July 2010 and March 2011, over $18,000 was paid from North's bank account to Sears.

North had a Sears MasterCard, and defendant had a card issued on North's account. Defendant acknowledged she had used North's Sears MasterCard. She testified North had added her as an authorized user on his Sears MasterCard in 2009. Because they were a couple, she did not have to tell him before she charged things. Defendant used North's bank account to pay the Sears MasterCard bill.

Defendant admitted that in 2011 she used North's credit card at a casino and used his money to gamble. She also admitted using North's credit card to pay for her son's birthday party, make a loan to her niece, pay for school books, and purchase a laptop computer for herself. Again, she claimed North knew she was using his money and

6

credit cards for these purposes. She reiterated because of their relationship as a couple, she was entitled to use the credit card.

North acknowledged he had a Sears credit card, but denied using it often. He also denied giving defendant permission to sign his name or get a credit card in her name on his account.

*Casino Withdrawals*

Between May 2010 and November 2010, there were approximately 38 withdrawals made from North's account from casinos. These "casino withdrawals" totaled over $9,000.

Defendant admitted she had withdrawn money from North's account at the casinos, but claimed North knew about the withdrawals. She claimed she had used defendant's card to make withdrawals on about 12 different occasions. North denied he ever gave defendant permission to use his automated teller machine (ATM) card or his money. North denied giving defendant permission to gamble with his money. He stated he did not gamble and had never been to the casinos from which the money had been withdrawn.

*Life Insurance Policies*

North's bank account also showed recurring payments being made for two separate insurance policies on which defendant was the named beneficiary. The first payment to an insurance company was made in June 2010.

Defendant testified after the funeral in San Diego, North told her he wanted a life insurance policy, so she arranged for her insurance person to talk to North. He purchased a policy to cover funeral services, and defendant was the named beneficiary of the policy.

North told Williams he had never taken out an insurance policy. North testified he did not remember buying a life insurance policy, and if he had, he would not have made defendant the beneficiary.

7

## PROCEDURAL HISTORY

An amended information charged defendant with first degree burglary (Pen. Code, § 459--count one) and theft by larceny, embezzlement, forgery, or fraud from a dependent adult (Pen. Code, § 368, subd. (d)--count two). As to count one, the information also alleged the crime was committed against a victim over the age of 65. (Pen. Code, § 667.9, subd. (a).) The information further alleged defendant had a prior conviction. (Pen. Code, § 667.5, subd. (b).)

Following trial, a jury found defendant guilty and found the elder victim enhancement allegation true. The trial court found the prior conviction enhancement true. The trial court denied probation and sentenced defendant to state prison for an aggregate term of nine years. The sentence consisted of the upper term of six years on the burglary conviction, plus an additional one-year term for the elder victim enhancement, a consecutive term of one year (one-third the midterm) on the theft from an elder dependent adult, and an additional one year for the prior prison term enhancement.

## DISCUSSION

### I

### *North's Conditional Examination*

A number of defendant's claims relate to the admission of North's conditional examination at trial. Specifically, defendant contends: (1) North was not competent to testify at the time of the conditional examination and therefore that testimony should not have been admitted at trial; (2) the magistrate presiding over the conditional examination found North was not competent to testify and there was not substantial evidence supporting the trial court's reversal of that finding; and (3) North's capacity was so impaired at the conditional examination that defendant's confrontation rights were violated.

8

*Background*

In consideration of North's significant physical disabilities, the parties agreed North's preliminary hearing testimony would also be a conditional examination conducted at the board and care facility. Prior to the examination, defense counsel indicated she was going to challenge North's competency as a witness, based on North's "inability to express himself as to be understood and he does not understand the nature and duty to tell the truth."

North testified as to his date of birth, place of birth, number of children, and address. The prosecutor asked, "If I were to tell you that I was a beautiful blonde woman, is that a truth or a lie?" and "If I was to tell you we were in China today, is that a truth or a lie."[5] North knew that both of those statements were not true.

North testified defendant had taken him places, like to the bank, and he paid her for that service. He remembered attending a funeral with defendant in San Diego, and that she had driven him there. He knew he used an ATM card to get money out of the bank "now and then." He denied giving defendant permission to use his ATM card or his money. He remembered selling a car to his neighbor, Vazquez, and that they had an agreement by which she would pay him $300 a month in cash. He did not remember the type of car, the amount of the down payment, or the total amount of the sale. He remembered that before he was admitted to a board and care facility, he collected the money from Vazquez. He denied giving defendant permission to collect the money. He denied gambling, ever having been to three particular casinos, or giving defendant permission to gamble with his money. He denied giving defendant permission to sign his name on any documents or get a Sears MasterCard in her name on his account. He recalled that among the furniture that had been in his home was a big screen television, a

---

[5] The prosecutor was a man and the examination took place at St. Clair's Nursing Center in Sacramento.

9

bedroom set, a couch, chairs, a dresser, and cabinets. He denied telling defendant to dispose of his furniture. He did not remember buying a life insurance policy and denied he would have made defendant the beneficiary of any policy.

North's testimony also revealed some confusion, poor eyesight, and memory loss. Although the examination took place at the board and care facility, North thought they were in a courtroom. He had bad eyesight, and could not identify defendant in the room. He also could not see what was written on the receipts for the car payments from Vazquez. He expressed confusion over the vehicle he owned, and the type of vehicle he had sold to Vazquez, and only remembered Vazquez by the name "Lulu."[6] He also denied selling her the vehicle for $14,000. He thought defendant had been shot and killed, and cut into four pieces. He was unsure of the current date and month. He was uncertain how he injured his ankle, and claimed he did not know defendant at the time he injured his ankle. He testified his money was kept in a vault, but he did not know where the vault was. He reported he had been making "too much money and the bank couldn't hold it so they put it in the vault," and believed his name was on every dollar in the vault. He did not remember a previous caretaker taking money and checks from him, although law enforcement made her pay him back.

The magistrate addressed North's competency. "In observing the demeanor and manner of the Mr. North in terms of the giving of the oath and in terms of his testimony, I am not persuaded that he understands the nature and duty to tell the truth. [¶] In terms of the second prong, whether or not he had the capacity to respond to the questions that were asked in a material and relevant way and responded to those questions--in terms of all questions that were material and relevant to Count One and Two, he properly responded. The question becomes there is a conflict in the evidence and whether or not

---

[6] Maria Vazquez's nickname is Lulu.

he's believable by way of credibility as distinct from the evidence that defense put forward to show that he is not a credible witness, and that is a jury question. That's the Court's ruling on competency." The magistrate then held defendant to answer. The minute order reflects defendant's motion to exclude North's testimony "due to his competency to testify as a witness--denied."

Prior to trial, the People moved to admit North's conditional examination testimony. North had been diagnosed with dementia, he was bed bound, and his cognitive abilities had declined since the conditional examination. Accordingly, the People argued the testimony was admissible as North was unavailable as a witness (Evid. Code, § 240, subd. (a))[7] and defendant had the opportunity to cross-examine North (§ 1291). Defendant requested a section 402 hearing to determine North's availability. In making that request, defense counsel stated, "after watching Mr. North interact with attorneys and answer questions [the magistrate] believed that Mr. North was in fact competent."

Defendant also requested the trial court determine North's competence to testify. The prosecution argued defendant was not entitled to relitigate North's competency at the time of the conditional examination, "because [defense counsel] raised multiple competency objections during the conditional examination and preliminary hearing testimony of Floyd North, all of them were denied by [the magistrate], and at the end of the hearing [the magistrate] found Mr. North competent." Defense counsel did not correct the assertion that the magistrate had found North competent to testify.

Prior to the section 402 hearing, the parties and the court made various corrections to the transcript of the conditional examination. The court then stated: "Since we're making corrections or clarifying any errors in the transcript, I think we discussed this last

---

[7] Undesignated statutory references are to the Evidence Code.

week just very briefly, and that is with respect to [the magistrate's] decision finding both prongs as to whether Mr. North was competent or not competent to provide testimony at the preliminary hearing and the holding order, I direct your attention to line 19 at page 81 -- [¶] . . . [¶] . . . where [the magistrate] states--this is part of the sentence, I am not persuaded he understands the nature and duty to tell the truth. [¶] Well, I'm happy to hear argument from counsel, but in reading all of the transcript, the testimony of the two witnesses and also [the magistrate's] decision, it does appear that the word not is either a clerical error or [the magistrate] misspoke, because clearly he then goes on to find the second prong of the competency question and finds that indeed Mr. North can understand the questions and respond to them and testify. And then ultimately [the magistrate] issues a holding order agains Miss Sykes. So I think if one reads everything, it is clear that the word not is either a clerical error of [the magistrate] just simply misspoke. [¶] Anything else you want to add to that?" The People indicated that in the previous discussions the "court and counsel seemed to agree that it might have been a typo of the word not." Defense counsel, who was present at the conditional examination, did not object to the clarification of the record and did not make any argument that the magistrate had not found North competent.

The trial court reviewed the conditional examination testimony and the DVD and concurred with the magistrate's "decision that Mr. North had the capacity to understand the oath that was administered to him and that Mr. North also had the capacity to communicate and be understood and to testify, and that also obviously he had personal knowledge of the subject that he was being questioned about. And he did have the capacity to perceive and recollect. And given all that, I concur with [the magistrate's] determination." Defense counsel stated her disagreement with the court's conclusion that North was competent, but expressed no disagreement with the assertion that the magistrate had found North competent.

12

The trial court conducted the section 402 hearing telephonically and based on Dr. Kirill Berejnoi's testimony found North was in the last stages of dementia and did not have the mental or physical ability to come to court. He was also essentially nonverbal. Accordingly, the court found North unavailable to testify. The court noted defense counsel had the opportunity to cross-examine North at the conditional examination and had done so. Defense counsel stated: "I would just add to that last bit. I don't believe that I was able to cross-examine fully to what I would have had he been here. I think there was a couple of objections in terms of relevancy, and I think it could have been looked into more at a trial. [¶] I know in the People's papers in front of the court, [the prosecutor] had compared that the People in total cross-examined him for 15 minutes and I cross-examined Mr. North for an hour. I would submit I probably would have gone into a little bit more detail." The court granted the People's request to admit North's prior testimony.

During the prosecution's case-in-chief, prior to North's testimony being played for the jury, defense counsel renewed her "objection that Mr. North was not competent at the time of the preliminary hearing and therefore the preliminary hearing video and transcript should not come in." The court reaffirmed its decision as to North's competence. The court also stated: "I know, [defense counsel] you indicated that had you known you would have done a more thorough cross-examination. I would note that your interests at the preliminary hearing is identical to your interests--is very similar if not identical to your interests in this trial, and that is to discredit Mr. North or to show that his testimony is inaccurate or incorrect. So I would note that your interests, if not identical, is very, very similar. [¶] Also, you clearly did have an opportunity to cross-examine the victim. You were informed at the time that it was a conditional examination. [¶] I know you indicated there were a few relevance objections sustained by the judge at the preliminary hearing but nevertheless overall it did not deny the defendant a reasonable, full

13

opportunity to cross-examine.  [¶]  For all of those reasons and the ones previously stated, I do affirm my decision."

A.

*North's Competence to Testify*

Defendant contends "North was not competent to testify as a witness and his testimony should not have been received."  Defendant argues North was disqualified as a witness, as his conditional examination testimony "was so disoriented, disjointed, fragmented, and non-responsive that it cannot fairly be said he had the ability either to understand the duty to tell the truth or to communicate what he remembered."  In support of this claim, defendant argues North did not know the day of the week, month, or year when the conditional examination was conducted, was unable to give responsive answers, believed defendant had been shot and cut into pieces, was unable to identify defendant at the hearing, was unable to recall which bank he used, denied owning or selling a van to Vazquez for $14,000, was unable to authenticate receipts, gave incomprehensible testimony regarding his home, and was confused about when he met defendant.

" 'As a general rule, "every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700; see Pen. Code, § 1321.)' " (*People v. Dennis* (1998) 17 Cal.4th 468, 525.)  "A person is incompetent and disqualified to be a witness if he or she is '[i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him' (Evid. Code, § 701, subd. (a)(1)), or is '[i]ncapable of understanding the duty of a witness to tell the truth.' (Evid. Code, § 701, subd. (a)(2).)" (*People v. Lewis* (2001) 26 Cal.4th 334, 360 (*Lewis*).)  "Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a

14

clear abuse of discretion." (*People v. Anderson* (2001) 25 Cal.4th 543, 572-573 (*Anderson*).)

A witness must also have personal knowledge of the subject of the testimony, based on the capacity to perceive and recollect. However, the capacity to perceive and recollect are not qualifications to be a witness; rather, the capacity to perceive and recollect are conditions for the admissibility of a witness's testimony on a certain matter. (*Anderson, supra,* 25 Cal.4th at pp. 573-574 [" '[T]he Evidence Code has made a person's capacity to perceive and to recollect a condition for the admission of [their] testimony concerning a particular matter instead of a condition of [their] competency to be a witness. And, under the Evidence Code, if there is evidence that the witness has those capacities, the determination whether [they] in fact perceived and does recollect is left to the trier of fact.' " (Italics omitted.)]; accord *People v. Dennis, supra,* 17 Cal.4th at pp. 525-526; *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1149-1150.)

North's testimony indicates that he understood the difference between the truth and a lie, and he understood he was required to tell the truth. He responded appropriately to the prosecutor's questions on this point. His testimony also indicates he was capable of expressing himself so as to be understood. North testified as to his date of birth, place of birth, number of children, and address. He knew that defendant had taken him places like to the bank and to San Diego for a funeral. He remembered attending a funeral with defendant in San Diego, and that she had driven him there. He remembered selling a car to his neighbor, Vazquez, and that they had an agreement by which she would pay him $300 a month in cash.

It is likely, however, North was beginning to suffer from the early effects of dementia, and as defendant points out, in some respects, his testimony was difficult to understand and nonsensical. But contrary to defendant's argument, the fact that a witness has a mental disorder, is difficult to comprehend, and responds in "incomplete, sometimes nonsensical, sentences" does not support a finding that the witness is

15

"incapable of communicating so as to be understood, pursuant to Evidence Code section 701, subdivision (a)(1)." (*Lewis, supra,* 26 Cal.4th at pp. 360-361; also citing "*People v. Anderson, supra*, 25 Cal.4th at p. 574 [no substantial evidence that witness, who delusionally believed imaginary son was present during murder, lacked capabilities under Evid. Code, § 701, subd. (a)(1) & (2)]; *People v. Jones*[1968] 268 Cal.App.2d [161,] 165-166 [prosecution witness characterized as a 'mental defective' by trial judge was not incompetent despite his conflicting and inconsistent testimony]; *People v. Scaggs* (1957) 153 Cal.App.2d 339, 354 [record did not disclose that witness who was described as senile and of unsound mind was incompetent as a matter of law]".) Rather, North's confusion, lack of recall, and sometimes incoherence were issues "of credibility for the jury and not relevant to the issue of [North's] competency. [Citation.]" (*Lewis, supra,* 26 Cal.4th at p. 361.) Accordingly, based on the record before us, we find no abuse of discretion in the determination that North was competent to testify.

Alternatively, defendant claims that North lacked the ability to "recollect and relate on crucial subjects" and therefore lacked personal knowledge on issues related to his bank accounts, the payments from Vazquez for the vehicle, and the removal of property from his home.

Defendant repeatedly challenged North's competence to testify. However, at no point during these proceedings, before, during, or after the conditional examination, in the pretrial hearings addressing the admissibility of North's conditional examination, or at trial, did defendant seek to have any of North's testimony excluded on the basis that North lacked personal knowledge or the ability to perceive and recall *particular* subjects. Nor did defendant make a specific section 702 objection to North's testimony. Without such an objection, the trial court was not required to determine whether North had personal knowledge before he testified on particular subjects such as his bank account, the car payments, or the removal of his property from his home. (§ 702, subd. (a); *Lewis, supra,* 26 Cal.4th at p. 357.)

16

Defendant claims this issue is preserved because, " 'despite inadequate phrasing, the record shows the court understood the issue presented.' (*People v. Gutierrez* (2003) 112 Cal.App.4th 1463, 1471, fn. 5.)" In issuing its ruling on North's competence, the trial court stated: "I concur with [the magistrate]'s decision that Mr. North had the capacity to understand the oath that was administered to him and that Mr. North also had the capacity to communicate and be understood and to testify, and that also obviously he had personal knowledge of the subject that he was being questioned about. And he did have the capacity to perceive and recollect."

The issue of a witness's competency under section 701 relates to a witness's capacity to communicate and to understand the duty to tell the truth. This is a distinct analysis and determination from a witness's lack of personal knowledge under section 702, which relates to the witness's capacity to perceive and recollect. (*Lewis, supra,* 26 Cal.4th at p. 356, fn. 4, citing 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 2001) Competency and Qualification of Witnesses, § 26.7, pp. 414-415.) "Although many, including defendant, have referred to a witness's capacity to perceive and to recollect (Evid. Code, § 702) as an issue of competency to testify, the term 'competency' is more precisely referring to a witness's qualification to testify under Evidence Code section 701, subdivision (b). (See *People v. Dennis, supra*, 17 Cal.4th at p. 525.)" (*Lewis,* at p. 356, fn. 4.) "[T]he capacity to perceive and recollect particular events, is determined in a different manner from fundamental capacity to act as a witness. Evidence may be excluded for lack of personal knowledge ' "only if no jury could reasonably find that [the witness] has such knowledge." ' (*Anderson, supra*, 25 Cal.4th 543, 573, italics omitted.) Thus, ' "if there is evidence that the witness [can perceive and recollect the events at issue], the determination whether he [or she] in fact perceived and does recollect is left to the trier of fact." ' (*Id*. at pp. 573-574, italics omitted.)" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1140.)

We do not agree the trial court's ruling indicates that it understood the objection to North's competence to be a witness also included objections to the admissibility of specific portions of North's testimony based on his inability to perceive and recall specific subjects. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 802 (*Riccardi*) [objection to the playing of the entire audiotape, did not fairly inform the trial court or prosecution that the defendant was objecting to portions of the audiotape that contained speculation, prejudicial evidence of the witness's fear of the defendant, her belief in the defendant's guilt, or a detective's belief as to the defendant's guilt].) That is, the objection did not fairly inform either the trial court or the People "of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 434-435.) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*) Accordingly, we find defendant's failure to object to *specific* portions of North's testimony on the basis that he did not have the ability to perceive or recall those *particular* subjects has forfeited this issue on appeal. (§ 353, subd. (a); *Lewis, supra,* 26 Cal.4th at p. 357.)

Moreover, even if we did not find the issue forfeited, we find no abuse of discretion. The fact that a witness's testimony is filled with exaggerations, "inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations" does not necessarily indicate the witness lacks the ability to perceive or recollect and does not preclude admitting the testimony. (*Lewis, supra,* 26 Cal.4th at p. 357) " '[T]he court may exclude the testimony of a witness for lack of personal knowledge *only if no jury could reasonably find* that he has such knowledge. [Citation.] . . . [I]f there is evidence that the witness has those capacities*, the determination whether he in fact perceived and does recollect is left to the trier of fact. [Citation.]' [Citations.]" (*Anderson, supra,* 25 Cal.4th at pp. 573-574.)

North's testimony certainly demonstrates his confusion on some issues and a lack of recall as to others. Nonetheless, this confusion and lack of recall does not demonstrate he lacked the capacity to perceive and recall. North testified defendant had taken him places, he paid her for her services, and he occasionally used an ATM card to withdraw money from the bank. He testified he sold a vehicle to his neighbor on an installment plan that included monthly payments of $300, and before he was admitted to a board and care facility, he collected the money in cash from the neighbor. He described the furniture in his home, including a large screen television. He denied giving defendant permission to use his ATM card or his money, denied he gambled or gave defendant permission to use his money to gamble, denied he authorized defendant to collect the monthly car payments from Vazquez, and denied telling defendant to dispose of his furniture. This was sufficient evidence for the trial court to determine North had the capacity to perceive and recall. Whether he in fact did perceive and recall was a matter for the jury. There was no abuse of discretion in admitting North's testimony.

B.

*Magistrate's Finding of Competence*

Defendant contends the magistrate found North was not competent and the trial court's reversal of that finding ignores the record, is not supported by the evidence, and is erroneous. She goes on to argue the erroneous "reversal" of the magistrate's ruling combined with the confusion and "patent detachment from reality" demonstrated by North's testimony, establishes the trial court abused its discretion in admitting North's testimony. As above, there was no abuse of discretion in finding North competent to testify and admitting his testimony.

Furthermore, defendant's complaint about the trial court "revers[ing]" the magistrate's finding on competence is forfeited. A party forfeits his or her right to attack error by expressly or implicitly agreeing or acquiescing at trial to the ruling or procedure

19

objected to on appeal. (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1408; *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685-1686.)

When requesting the section 402 hearing on North's unavailability, defense counsel stated, "after watching Mr. North interact with the attorneys and answer questions [the magistrate] believed that Mr. North was in fact competent." During further discussion on the pretrial motions, the parties questioned whether the trial could determine both North's current competence to testify and, retrospectively, his competence at the conditional examination. The trial court indicated it had examined the video and transcript and believed the magistrate had correctly determined North was competent. This raised the question as to what the magistrate's finding was, given that the reporter's transcript reflected the magistrate stated he was "not persuaded [North] understood the duty to tell the truth."

Later, as the parties were making corrections to the conditional examination record, the trial court recounted that previous discussion regarding the magistrate's ruling on whether North was competent to testify at the time of the conditional examination. The trial court quoted the portion of the transcript which reflected the magistrate stated he was "not persuaded [North] understood the duty to tell the truth." The trial court then indicated that in viewing the entirety of the record, it appeared the addition of the word "not" into the ruling was either a clerical error or the magistrate had misspoken. The trial court offered the parties the opportunity to argue the matter and asked if either party wanted to add anything. The People reported the court and counsel had agreed the reporter's transcript "might have been a typo of the word not." Defense counsel did not object to that statement, indicate any disagreement with it, or offer any argument.

It is clear, that defense counsel continued to object to, and disagree with, the finding by both the magistrate and the trial court that North was competent to testify. That issue was preserved for appeal. However, the issue of North's competence is distinct from whether the trial court erred in correcting the record to reflect what it

20

believed the magistrate's ruling on competence was. The record before us indicates defense counsel agreed the magistrate had made the finding North was competent and acquiesced in the correction of the record, but disagreed with the substance of the magistrate's finding. Accordingly, any objection to the correction of the record is forfeited.

Defendant contends the failure to object here was ineffective assistance of counsel. We disagree. In order to prove ineffective assistance of counsel, defendant must show: "(1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674].) "If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*Rodrigues,* at p. 1126.)

On the record before us, we believe that defense counsel did not object to the correction of the record to properly reflect the magistrate's ruling because the magistrate had, in fact, found North competent. "An attorney has an unqualified duty to refrain from acts which mislead the court. (Bus. & Prof. Code, §§ 6068, 6128, subd. (a).) The representation to a court of facts known to be false is presumed intentional and is a violation of the attorney's duties as an officer of the court. (*Id.*, §§ 6068, 6103; see *Pickering v. State Bar* (1944) 24 Cal.2d 141, 144.)" (*Jackson v. The State Bar* (1979) 23 Cal.3d 509, 513.) We will not find counsel ineffective for acting in accord with her duties as an officer of the court.

C.

*Confrontation Clause*

Defendant also contends the admission of North's conditional examination violated her Sixth Amendment right to confront and effectively cross-examine witnesses, because North's mental condition was so impaired it was not possible to effectively

21

cross-examine him, and the magistrate prejudicially restricted his right to cross-examine North at the conditional examination. Defendant did not make these claims in the trial court nor did defendant object to the admission of North's testimony based on the confrontation clause or the Sixth Amendment. Defendant asserts the objection was adequately preserved because counsel stated she did not believe she had been able to "cross-examine fully" at the conditional examination. Defendant also argues even if "counsel did not make a specific and timely Confrontation Clause objection or cite the Sixth Amendment, this constitutional claim is not forfeited because overruling [defendant's] motion to preclude North's testimony on competency grounds--whether under section 701 or 702--resulted in the admission of the transcript from the preliminary hearing, which, in turn, had the consequence of violating [defendant's] rights under the Confrontation Clause."

Defense counsel only made one statement in the trial court regarding cross-examination of North in the conditional examination. After the trial court indicated its intention to admit North's conditional examination based on its finding that North was unavailable for trial, the trial court stated, "I would note that with respect to the preliminary hearing, [defense counsel] cross-examined Mr. North. The defendant had an opportunity to cross-examine the declarant, Mr. North, and [defense counsel] did so." Defense counsel responded: "I would just add to that last bit. I don't believe I was able to cross-examine fully to what I would have had [the victim] been here. I think there was a couple of objections in terms of relevancy, and I think it could have been look into more at a trial. [¶] I know in the People's papers in front of the court, [the prosecutor] had compared that the People in total cross-examined him for 15 minutes and I cross-examined Mr. North for an hour. I would submit I probably would have gone into a little bit more detail."

We do not believe this statement constitutes an objection at all. As above, although an objection need not be made in any particular form, it must alert the trial court

22

an objection to particular evidence has been made, and the nature of that objection. Counsel's statement did neither.

Furthermore, even if we construed this statement as an objection, it was not an objection on the basis of the confrontation clause or defendant's Sixth Amendment rights. The failure to raise a claim of federal constitutional error before the trial court forfeits the issue on appeal unless " 'it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, *in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the Constitution . . . .*' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809, italics added; *Riccardi, supra,* 54 Cal.4th at p. 801; *People v. Redd* (2010) 48 Cal.4th 691, 730 (*Redd*).) That is, even when a defendant "did not specifically invoke the federal Constitution at trial, [s]he may raise this contention on appeal to the extent [s]he argues that the *erroneous overruling of the objection actually made* also had the consequence of violating [her] federal confrontation rights. (*People v. Gutierrez, supra*, 45 Cal.4th at p. 809.)" (*People v. Loy* (2011) 52 Cal.4th 46, 66, italics added; accord *Redd,* at p. 730.) As we have detailed above, the trial court did not err in finding North competent. Accordingly, defendant has forfeited her "contentions of federal constitutional error by failing to assert them before the trial court. (*People v. Redd*[*, supra,*] 48 Cal.4th [at p.] 730; *People v. Gutierrez*[*, supra,*] 45 Cal.4th [at p.] 809 [confrontation clause claim forfeited by failing to raise it below].)" (*Riccardi,* at p. 801.) Where there is no error in overruling the objection made, the constitutional claim is not preserved. (*Redd,* at p. 730.)

II

*Penal Code Section 654*

Defendant contends the trial court erred under Penal Code section 654 in failing to stay the term for burglary. She contends based on the prosecutor's argument that the

theft of the property from the home supported both the burglary and the larceny charges, it "is virtually certain that the alleged theft [of North's property] was used for both counts."

*Background*

In closing argument, the prosecutor stated, "[T]his case . . . really comes down to credibility, . . . [¶] . . . Both witnesses, that is, both Mr. Floyd North and the defendant, cannot be telling you the truth. You either believe the victim in this case, Floyd North, or you believe the defendant." "Count one is a violation of Penal Code section 459, commonly referred to as residential burglary, burglary in the first degree. That requires the proof to you of two elements. The first is that the defendant entered an inhabited dwelling house. That is just enter. Just go in. And second, that at the time of that entry the defendant intended to commit theft by larceny. [¶] Now theft by larceny is further defined for you . . . . Theft by larceny then has four elements . . . . [¶] Theft by larceny . . . means what it sounds like . . . the defendant took somebody else's property without that person's consent. When it was taken she intended to deprive them permanently of its use and value . . . and that the property was moved and kept. [¶] What's interesting about the crime of residential burglary is that the crime is complete upon entry. If . . . the defendant entered Floyd North's house with the requisite intent to steal, she has committed residential burglary. The instructions told you she doesn't need to steal thereafter; the crime is complete upon entry with the right intent." "Moving on to Count Two. This is a violation of Penal Code section 368 [subdivision] (d), theft of property from an elder adult. That requires the proof of four elements . . . . [¶] First, the defendant must have committed theft by larceny, embezzlement, forgery, or fraud. . . . [¶] The second element is that the property taken was owned by an elder adult. . . . [¶] The third element that the property, goods, or services obtained were worth more than $950. . . . [¶] And finally, the fourth element, that the defendant knew or reasonably should have known that the owner of the property was an elder adult." The prosecutor

24

went on to describe the four different theories under which the property could have been taken and the jury instructions which related to each. The prosecutor also advised the jury it had to unanimously agree on the act of theft, but not necessarily on which theory the act fell under. The prosecutor also made clear the jury was not beholden to, or limited by, the prosecution's theory of the case.

As to the acts supporting the various theories of theft, the prosecution argued there were five under the theory of theft by larceny, "[w]e have the property from his home, collecting car payments from the neighbor, what I'm calling the act of draining his savings account, the Sears MasterCard transactions . . . , as well as the Colonial Penn life insurance policy." "And so I submit to you, . . . that the five acts by which she stole from Floyd North all fall under that theft by larceny theory. [¶] The same acts also fall under additional theories, and you'll see that when I talk about theory number two, embezzlement, which is . . . [t]his is the act of draining Floyd North's savings account and the Sears MasterCard. [¶] The third theory of theft, the acts that the People are telling you are acts of theft under a forgery theory are, again, collecting the car payments and the Colonial Penn Life Insurance company. [¶] And the same can be said under the fraud theory, which is a fourth theory: Collecting the car payments and Colonial Penn." The prosecutor then argued the specifics of each of these acts under each theory of theft. The prosecutor put forth extensive argument on the theories of theft shown by the car payments, the life insurance policy, draining of North's accounts by check and ATM withdrawals, and the Sears MasterCard. The prosecutor also argued: "There's the act of cleaning out his house, which can be an act upon which you find the defendant guilty of theft of property of an elder because you'll recall the crime of burglary is complete upon entry with the intent. You don't even need to steal. The act of stealing can be and is a separate crime."

Defendant argued North knew and consented to her taking his property and using his money. Specifically, that he told her to clear out his house; he knew she was writing

25

checks for herself because they were payment for her services; she obtained the insurance policies after they attended the funeral at North's request; he knew she was gambling with his money; and, she was an authorized user of the Sears MasterCard.

In rebuttal, the prosecution again emphasized the credibility issue. "It's clear, ladies and gentleman, that you cannot believe both Mr. North and the defendant. If you believe--if you credit the testimony of the defendant in this case in one or more respects that go to the elements in this case, then you will be acquitting her of both of the counts. [¶] But if you consider her testimony and the factors that the court instructed you on how to evaluate witnesses, she has incredible credibility problems."

At sentencing, the trial court stated it was "imposing a consecutive sentence because the crimes were committed at different times or separate places rather than being committed so close in time and place as to indicate a single period of aberrant behavior."

*Analysis*

Penal Code section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The question whether Penal Code section 654 applies in a given case is one of fact for the trial court, which is vested with broad latitude in making its determination. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.) "On this issue, we review the court's explicit or implicit factual resolutions for substantial evidence. [Citations.]" (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338 (*McCoy*).) "We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

In *McCoy,* this court held that a trial court exercising its sentencing discretion may base its decision on *any* facts that are in evidence at trial, without regard to the verdicts,

26

unless some circumstance in those verdicts forecloses the trial court from doing so. (*McCoy, supra*, 208 Cal.App.4th at p. 1340.) For example, in *People v. Siko* (1988) 45 Cal.3d 820, both the charging document and the verdicts had specified two particular sex offenses as the basis for generic charges of lewd and lascivious conduct. Neither the closing argument nor the instructions had suggested any other basis for the molestation counts. (*Id*. at p. 826.) "*Siko* is thus authority that where there is a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying [Penal Code] section 654." (*McCoy,* at p. 1339.) Where there is not a basis for identifying the specific factual basis for a verdict, however, the trial court is not foreclosed from considering all the available evidence in making its decision under Penal Code section 654.

As defendant notes, the prosecutor argued the theft of property from the home could support the theft by larceny charge, as well as the burglary charge. However, the prosecutor also argued four other acts of theft could support the theft charge in count two, receiving the car payments, draining North's checking account by withdrawing money at the casinos and writing checks to herself, using the Sears MasterCard, and obtaining the insurance policies. The prosecutor made clear the case was primarily about credibility, and if the jury believed any part of defendant's testimony as related to the elements of the offenses, it would acquit on *both* counts.

In any event, it is not the prosecutor's arguments or what the jury found that is controlling. As we emphasized in *McCoy*, in the absence of some circumstance foreclosing the trial court's sentencing discretion, our focus is on whether the trial court's explicit or implicit finding is supported by substantial evidence. That evidence can be independent of the facts or theories underlying the jury's verdict. (*McCoy, supra,* 208 Cal.App.4th at pp. 1338, 1340.) There was nothing in the manner in which the case was charged and tried, the jury was instructed, or in the arguments of counsel, which foreclosed the trial court from considering all of the evidence adduced at trial in making

its sentencing decision under Penal Code section 654. " 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability.' [Citation.]" (*People v. Valli* (2010) 187 Cal.App.4th 786, 794.) Defendant committed many more offenses than she was either charged with or convicted of. There was substantial evidence of multiple acts of theft committed on separate occasions in different places and each in a distinctive manner. We conclude the trial court did not err in failing to stay the sentences under Penal Code section 654.

## DISPOSITION

The judgment is affirmed.


_____/s/_____
Blease, Acting P. J.


We concur:



_____/s/_____
Hoch, J.



_____/s/_____
Renner, J.